UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x

CHRISTOPHER BRINSON,

                          Petitioner,

        - against -

PAUL ANNETTS, Superintendent, Downstate
Correctional Facility,

                          Respondent.
------------------------------------------------------- x

Civil Action No.
CV-05-5582 (DGT)

ORDER

TRAGER, J.

        Petitioner was convicted of robbery and grand larceny in New

York State Supreme Court, Queens County.  Petitioner files this

pro se petition for a writ of habeas corpus under the

Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28

U.S.C. § 2254 (2000), to vacate his judgment of conviction.  For

the following reasons, his petition is denied.


                            **Background**

                               **(1)**

        The evidence presented at trial supports the following

statement of facts.  Early in the morning of December 3, 1998,

petitioner stole twenty dollars from Surinder Singh outside Mars

Deli on Kissena Boulevard near Cherry Avenue in Flushing, Queens.

Petitioner was unarmed but threatened to attack Singh.  Singh

lived one block away from Mars Deli, did most of his grocery

shopping there, and frequently bought coffee there before

starting his shift driving a taxicab. Singh recognized petitioner, having seen him at Mars Deli once a week for the three to four months before the theft. Singh did not report the altercation to the police.

Three days later, on the afternoon of December 6, 1998, Surinder and his cousin, Amajitt Singh, walked to the deli to buy beer. After paying for the beer, Surinder was carrying about fifty dollars. As they were walking back to Surinder's apartment, petitioner grabbed Surinder by the shoulder from behind and spun him around. Petitioner with two accomplices - whom Surinder did not recognize - surrounded him. While demanding Surinder's money, petitioner held a knife to his abdomen. Surinder pulled the cash from his pocket and handed it to petitioner. After petitioner and his accomplices fled, Surinder returned home and called the police. The police arrived about fifteen minutes later and drove Surinder and Amajitt in their patrol car around the neighborhood to look for petitioner and his accomplices. Surinder and Amajit did not find them.

Two days later, on the evening of December 8, 1998, Edward Simonetti, a detective in the New York City Police Department ("NYPD"), called Surinder and Amajitt into the 109th Precinct station house to interview them and to canvass the neighborhood around Mars Deli with them. Simonetti had been investigating a series of strongarm robberies - robberies in which no weapon was

involved - that had occurred within two blocks of Mars Deli. He had been issued a robbery pattern sheet describing two to four attackers, one, white, the others, black. The robbery pattern sheet had also been distributed to police patrolling the 109th Precinct. At the station house, Surinder described his three attackers - including petitioner - as black men, eighteen to twenty years-old who weighed 140-160 pounds. During his interview, Simonetti received a call from a member of the NYPD's Street Crime Unit in which he was told that a white man had been spotted at the corner of Kissena Boulevard and Cherry Avenue who resembled one of the suspects described in the robbery pattern sheet. Intending on conducting the neighborhood canvass after investigating the suspect identified by the Street Crime Unit, Simonetti drove to Kissena and Cherry with Surinder and Amajitt in the back seat of the car. When they arrived, Surinder spontaneously pointed to petitioner, identifying him as his attacker. Surinder described petitioner by his sweatshirt, which he said petitioner wore during at least one of the robberies; he recognized the sweatshirt by its orange hood. Amajitt confirmed the identification.

Earlier that night, the corner of Kissena Boulevard and Cherry Avenue, a few feet away from Mars Deli, had become the scene of a _Terry_ stop conducted by the Street Crime Unit. The unit had been assigned to the 109th Precinct to investigate the

3

same pattern of robberies that Simonetti was investigating.
While driving down Kissena Boulevard, Detective Joseph Saccone of
the Street Crime Unit observed petitioner and two other men, who
appeared to have large bulges at their waists, standing in front
of Mars Deli.  Saccone and two other detectives approached them,
asked them if they were carrying any weapons and frisked them.
The bulges proved not to be weapons.  (In one instance, the bulge
was a personal tape recorder.)

While Saccone was collecting pedigree information from the
three men, Simonetti approached him and told him that Surinder
had identified petitioner as the attacker in two robberies.
Simonetti arrested petitioner.  While processing petitioner's
arrest, Simonetti noted that he was a black man, five feet six
inches, 116 pounds and twenty-three years old.

## (2)

Petitioner was charged with robbing Surinder on December 3
and December 6, 1998.  In a pretrial motion, petitioner requested
a Wade hearing at which he intended to ask the hearing court to
suppress Surinder's identification testimony.  According to
petitioner, the identification procedure was conducted in such an
impermissibly suggestive manner that it greatly increased the
likelihood of misidentification.  The court denied petitioner's
motion for a Wade hearing on the ground that the canvass was not

4

police-arranged. People v. Brinson, No. 3997-98, slip op. at 3
(Sup. Ct. Queens County Mar. 25, 1999)("Brinson I").

Petitioner was convicted of robbery in the second degree,
robbery in the third degree and grand larceny in the fourth
degree and sentenced to thirteen to sixteen years imprisonment.
He appealed raising two issues: 1) the court's denial of a Wade
hearing violated his right to due process and 2) the State's
cross-examination and summation violated his right to due
process. In a decision dated February 10, 2003, the Appellate
Division, Second Department, held that, under People v. Dixon, 85
N.Y.2d 218, 647 N.E.2d 1321 (1995), the trial court was required
to hold a Wade hearing and remitted the matter to the trial
court. People v. Brinson, 753 N.Y.S.2d 740, 302 A.D.2d 471 (2d
Dep't 2003); see Dixon, 85 N.Y.2d at 223 ("[C]anvassing [a] crime
area in a police car was an identification procedure undertaken
at the deliberate direction of the State.") (internal quotation
marks omitted).

On May 1 and May 8, 2003, a Wade hearing was held at which
Simonetti and Saccone testified. Before evidence was presented,
the defense moved the court to expand the scope of the hearing to
include an inquiry, under Dunaway v. New York, 442 U.S. 200
(1979), into whether his identification was the result of an
illegal seizure.

According to Saccone, petitioner was never placed in

5

handcuffs or arrested for the duration of the stop-and-frisk. Saccone and the two police officers assisting him with the Terry stops were entirely dressed in street clothes. Saccone described the street in front of Mars Deli as having "[m]edium to heavy pedestrian traffic" at the time. Wade Hr'g 14:14, May 1, 2003. Likewise, Simonetti testified that when he arrived at the site of the Terry stop, there were between fifteen and twenty people on the street, both black and white. Wade Hr'g 10, May 8, 2003.[1]

In closing, petitioner's attorney argued that Surinder's identification of petitioner bore characteristics of a "point-out," a show-up and a lineup and was the result of suggestive procedure. Id. at 37:7-8, 42. According to petitioner, any lineup with only three participants is impermissibly suggestive. Id. at 42:23-25. Next, petitioner implied that the circumstances leading up to Surinder's identification of petitioner--i.e., the Terry stop and Simonetti's neighborhood canvass--were coordinated. See id. at 44:4-11. In that way, the identification also resembled a show-up. Id. at 43.

The second part of petitioner's argument was that he was in custody at the time of his identification since he was not

---

[1] Saccone also testified that, in addition to the three young men in front of Mars Deli, the Street Crime Unit stopped and frisked a white man on December 8, 1999, and Simonetti testified that he was interested in that man as a suspect in the pattern of robberies in the area, not necessarily Surinder's robbery. Wade Hr'g 19, May 1, 2003; Wade Hr'g 9-10, May 8, 2003.

allowed to leave after the stop-and-frisk until the police had obtained his pedigree information. Id. at 39-40. According to petitioner, there was no reason to detain him because the police had no reason to suspect him of carrying a weapon. Id. at 39.

The State argued that Simonetti's neighborhood canvass with Surinder and Amajitt was independent of the Street Crime Unit's Terry stop, and the identification was, thus, not the result of a show-up. Id. at 50-54. Furthermore, the searches and seizures were limited in scope and duration and were justified. Id. at 47-48.

The court denied the motion to suppress Surinder's identification testimony. The court found that the actions of Simonetti and Saccone were not coordinated. People v. Brinson, no. 3997-98, slip op. at 6 (Sup. Ct. Queens County May 12, 2003) ("Brinson II"). Furthermore, the court found that petitioner was not in custody at the time of his identification. Id. at 5.

As to the identification procedure, the court found that it was not conducted in a manner that increased the likelihood of misidentification. Id. at 6. According to the court, the identification was spontaneous and in no way prompted by the police. Id. at 6.

Petitioner appealed again and filed a supplemental brief which raised the following issues: 1) since the police did not have reasonable suspicion to stop and frisk him, the

identification which resulted from his detention should have been
suppressed, and 2) Surinder's identification of petitioner was
the result of a highly suggestive show-up because it took place
several days after the robberies and petitioner was in custody
and surrounded by police at the time.

On November 10, 2003, the Appellate Division, Second
Department, affirmed the court:

> The evidence adduced at the suppression
> hearing supports the Supreme Court's denial
> of that branch of the defendant's omnibus
> motion which was to suppress identification
> testimony. Contrary to the defendant's
> contention, he was not in police custody when
> the complainants unequivocally identified him
> during a canvass of the area where the crime
> occurred. We also find no merit to the
> defendant's argument that the identification
> was the result of unduly suggestive police
> procedures.

People v. Brinson, 766 N.Y.S.2d 893, 894, 1 A.D.3d 443, 444 (2d
Dep't 2003) (internal citations omitted).

The Appellate Division also stated: "The defendant's
remaining contentions either are unpreserved for appellate review
or without merit." Id. The Court of Appeals denied petitioner's
application for leave to appeal on January 29, 2004. People v.
Brinson, 1 N.Y.3d 595, 808 N.E.2d 363, 776 N.Y.S.2d 227 (2003).

Petitioner then filed a motion to vacate the judgment under
section 440.10(1)(h) of New York's Criminal Procedure Law because
it was reached in violation of the constitutions of New York and
the United States.  According to petitioner, he was denied the

effective assistance of counsel at trial--by his attorney's
failure to timely object when the State did not submit certain
discovery documents--and at the Wade hearing--by his attorneys'
failure to subpoena two retired police officers.  The hearing
court denied petitioner's claims as procedurally barred, holding
that they should have been raised on direct appeal since they
were based entirely on matters on the record.  People v. Brinson,
no. 3997/98, slip op. at 1-2 (Sup. Ct. Queens County Mar. 28,
2005)("Brinson III").

By petition dated November 18, 2005, petitioner sought a
writ of habeas corpus under § 2254 of Title 28 of the United
States Code on the grounds that his identification resulted from
1) an illegal search and seizure in violation of his rights under
the Fourth Amendment and 2) an "unduly suggestive" identification
procedure.

In answering petitioner's Fourth Amendment claim, the State
invoked Stone v. Powell, 428 U.S. 465 (1976), which held that,
"where the State has provided an opportunity for full and fair
litigation of a Fourth Amendment claim," relief under § 2254 is
unavailable when the claim rested on the ground that evidence
obtained during an unconstitutional search was introduced at
trial.  428 U.S. at 482.  Furthermore, according to the State,
the identification procedure was not suggestive.

Petitioner argued that Stone v. Powell did not preclude his

Fourth Amendment claim because he was not provided an opportunity to fully and fairly litigate it.  Petitioner claimed that his opportunity to present the claim was compromised because more than four years had elapsed between his arrest and the <u>Wade</u> hearing, rendering the other officers involved in the <u>Terry</u> stop and other witnesses unavailable.

Furthermore, petitioner claimed that his opportunity to litigate the claim was compromised because his counsel at the <u>Wade</u> hearing was unprepared.  According to petitioner, his hearing counsel, though competent, was not as familiar with the case as his trial counsel, who, petitioner argued, should have been appointed to represent him at the hearing as well.  However, petitioner argued that his hearing counsel would have been effective if the court had given him more time to prepare.

Regarding the identification, petitioner argued that the procedure was a highly suggestive show-up.  He was surrounded by white police officers who, though in street clothes, wore their badges around their necks, was standing at the scene of the robberies when he was identified, and wore the same sweatshirt with a brightly-colored hood that Surinder said he wore during at least one of the robberies.

## Discussion

### (1)

### Fourth Amendment Claim

Ground One of the petition challenges petitioner's identification as the result of an illegal detention, in violation of his rights under the Fourth Amendment. According to the Supreme Court in Stone v. Powell, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," habeas relief is unavailable when the claim rested on the ground that evidence obtained in an unconstitutional search was introduced at trial. 428 U.S. at 482. Therefore, the merits of Ground One may be considered only if the State has failed to provide "an opportunity for full and fair litigation" of petitioner's Fourth Amendment claim.

The Court of Appeals for the Second Circuit has found that state courts have failed to provide an adequate opportunity to present a Fourth Amendment claim if one of the following situations arise: 1) "the state provides no corrective procedures at all to redress Fourth Amendment violations" or 2) "where the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process." Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977). An "unconscionable breakdown" is typically identified by a "disruption or obstruction" of the corrective process.

<u>Capellan v. Riley</u>, 975 F.2d 67, 70 (2d Cir. 1992)(citation omitted).

Petitioner does not argue that New York provided inadequate corrective procedures to redress Fourth Amendment violations.[2] Rather, he claims that there was an unconscionable breakdown in the process. Petitioner has made no such showing. Petitioner never requested a hearing before his trial to determine whether the identification was the result of an illegal seizure under the Fourth Amendment as interpreted in <u>Dunaway v. New York</u>, 442 U.S. 200, 213 (1979). Therefore, the Appellate Division ordered only a <u>Wade</u> hearing. However, in an abundance of caution, the hearing court expanded the hearing to include a Fourth Amendment inquiry at petitioner's eleventh-hour request.

The two-day hearing itself provided petitioner ample opportunity to attack the legality of the <u>Terry</u> stop. Saccone and Simonetti testified at length concerning the facts surrounding petitioner's identification and arrest, and the court rendered a reasoned opinion regarding the issue. <u>See, e.g.</u>, <u>Benton v. Brown</u>, 537 F. Supp. 2d 584, 591 (S.D.N.Y. 2008).

Petitioner also claims that he was denied a full and fair opportunity because his counsel at the <u>Wade</u>/<u>Dunaway</u> hearing did

---

[2] Indeed, the Second Circuit has endorsed New York's procedures for addressing complaints of Fourth Amendment violations. <u>See</u> <u>Capellan</u>, 975 F.2d at 70 n. 1; <u>Gates</u>, 568 F.2d at 837.

not have adequate time to prepare for it and was unfamiliar with
the case.  The record does not support this claim.  Petitioner
was represented by two attorneys, one of whom cross-examined
Saccone and Simonetti at length over two days, argued in
summation most of the points raised by petitioner in his habeas
petition and accompanying memorandum of law, and convinced the
court to expand the Wade hearing into a Dunaway hearing.  Without
counsel, therefore, the Fourth Amendment claim that, according to
petitioner, was prejudiced by counsel's inadequate preparation
and familiarity would not have been heard at all.  This, then,
clearly was not a situation in which a court hurried a Fourth
Amendment claim to hearing without effective counsel.  Compare
Tackno v. Blackburn, 571 F.2d 1383, 1383-84 (5th Cir. 1978)
(petitioner was afforded a full and fair appeal when his direct
appeal had been pending for two years when he received a letter
from the clerk of the Louisiana Supreme Court that his hearing
was scheduled for argument within a month, his counsel had not
yet filed a brief, counsel's brief was filed six days prior to
argument, and appellant's pro se brief was filed one day later)
with Boyd v. Mintz, 631 F.2d 247, 250 (3d Cir. 1980) (petitioner
had no opportunity to litigate a Fourth Amendment claim when the
court denied his motion to suppress after his Public Defender had
"one business day to investigate [petitioner's] indigency, accept
him as a client, interview him about the crimes charged,

13

investigate the validity of the search and seizure issue, and
prepare and file [the] motion").[3]  Even if petitioner were not
afforded an opportunity to litigate his Fourth Amendment claim
before the Appellate Division ordered a <u>Wade</u> hearing, he
certainly received a full and fair opportunity to litigate it at
the hearing.  Thus, petitioner's Fourth Amendment claim is
unavailable as a basis for granting habeas corpus.


### (2)

### The Identification

Petitioner also challenges the admission of his
identification, which he claims was the result of an
impermissibly suggestive procedure.  The propriety of an
identification procedure is a mixed issue of law and fact.  <u>See</u>
<u>Sumner v. Mata</u>, 455 U.S. 591, 597 (1982)("[T]he ultimate question
as to the constitutionality of [the conduct of a photographic
lineup] is a mixed question of law and fact"]).  Therefore, a
writ of habeas corpus will not issue unless the trial court's

---

[3] Although a procedurally barred Fourth Amendment claim is
not cognizable on habeas review, it can form the basis of a Sixth
Amendment claim.  Where counsel's "failure to litigate a Fourth
Amendment claim competently" resulted in an unfair trial, habeas
corpus is still available.  <u>Kimmelman v. Morrison</u>, 477 U.S. 365,
375, 382 (1986).  Petitioner does not make that claim here.
However, even were petitioner to make such a claim, it would fail
under <u>Strickland v. Washington</u>, since counsel's conduct falls
well within "the wide range of reasonable professional
assistance." 466 U.S. 668, 689 (1984).

decision to admit the identification evidence involved an "unreasonable application" of federal law; this means that the court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." <u>Williams v. Taylor</u>, 529 U.S. 362, 413 (2000).

The Supreme Court is silent on whether the identification of a criminal defendant by a witness taking part in a police-arranged street canvass is an identification procedure under <u>Wade</u> and its progeny. Some lower courts have held that such events constitute identification procedures. <u>See, e.g.</u>, <u>United States ex rel. Clemmer v. Mazurkiewicz</u>, 365 F. Supp. 1158, 1163 (D. Pa. 1973) (procedure was a lineup when the police arranged with suspect's employer to have suspect and five or six others work outside a window through which identifying witness made identification); <u>Bratten v. Delaware</u>, 307 F. Supp. 643, 647 (D. Del. 1969) (procedure was a confrontation when witness was summoned by the police to view a suspect who was standing in front of motel with four other men and was not in custody).[4] Whether or not <u>Wade</u> applies to petitioner's identification, the hearing court did not unreasonably apply the principles derived

---

[4] As noted above, the state of New York has determined that "canvassing [a] crime area in a police car [is] an identification procedure" whose propriety is to be determined at a <u>Wade</u> hearing. <u>See</u> <u>Dixon</u>, 85 N.Y.2d at 223.

from <u>Wade</u> and Supreme Court rulings following it.

The Constitution does not guarantee the right to counsel at pre-indictment identifications. <u>See</u> <u>Kirby v. Illinois</u>, 406 U.S. 682, 690 (1972). Nonetheless, due process forbids evidence of an identification that both results from an "unnecessarily suggestive" procedure and, when viewed in the totality of circumstances, is unreliable. <u>Stovall v. Denno</u>, 388 U.S. 293, 301-302 (1967), <u>overruled on other grounds by</u>, <u>Griffith v. Kentucky</u>, 479 U.S. 314, 328 (1987). <u>See</u> <u>Kirby</u>, 406 U.S. at 691 (quoting <u>Stovall</u>); <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony"). An identification is unreliable if there is a "very substantial likelihood of irreparable misidentification." <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968).

A.  <u>Identification Procedure</u>

A parallel question to the issue of whether the procedure was suggestive is whether it is properly characterized as a point-out or a show-up. Petitioner characterized the identification as a show-up, which "generally is thought to present greater risks of mistaken identification than a lineup." <u>Moore v. Illinois</u>, 434 U.S. 220, 229 (1977). The State characterized it as a point-out. <u>See, e.g.</u>, <u>Bratten</u>, 307 F.

Supp. at 647 (procedure whereby witness was summoned by police to view suspect with his friends standing in a motel parking lot that resulted in identification and arrest of suspect did not violate due process).

The identification here bore aspects of both. From petitioner's perspective, the identification was indistinguishable from a show-up; he was seized by the police then identified by a witness. From the State's perspective, petitioner's seizure was limited and did not factor in the identification. The only person upon whom suggestiveness comes to bear, however, is the identifying witness. For instance, it may be improper to highlight a suspect participating in a lineup by dressing him in brightly colored clothes and the fillers surrounding him in grey. Cf. United States v. Triplett, 104 F.3d 1074, 1080 n. 2 (8th Cir. 1997) (rejecting defendant's argument that his "'brightly colored, loud, but surprisingly tasteful, Hawaiian-type print shirt' drew unwarranted attention to him 'in the midst of a sea of solid white tops and dark green bottoms'" on the ground that he chose his clothing). It would be much less so when the witness is color-blind. Likewise, it is highly suggestive when the police present a lone, shackled suspect to a witness for identification. See, e.g., Archuleta v. Kerby, 864 F.2d 709, 711 (10th Cir. 1989) (trial court found and prosecution conceded that presentation of handcuffed defendant in back of

police car was unnecessarily suggestive though the identification was otherwise reliable). See also Styers v. Smith, 659 F.2d 293, 297 (2d Cir. 1981) (holding police statement to witness that defendant was in custody coupled with show-up rendered identification procedure unnecessarily suggestive); Moore, 434 U.S. at 229. It is much less so if the suspect was not presented to the witness, was not handcuffed, was surrounded by fifteen to twenty people on a sidewalk, and the police were indistinguishable from the crowd. See, e.g., United States v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994) (procedure not unnecessarily suggestive when confidential informant identified defendant who was handcuffed, in the custody of the police, with his face lit by flashlights); Valtin v. Hollins, 248 F. Supp. 2d 311, 319 (S.D.N.Y. 2003) (finding that viewing defendant while he was in custody was not prejudicial when defendant was not handcuffed and was surrounded by police who were not in uniform). Indeed, criminal suspects participating in conventional, station-house lineups often are in police custody without the witness knowing it.

In light of the totality of circumstances surrounding the identification, it was more akin to a point-out than a show-up and, thus, unlikely to be unnecessarily suggestive. Without reaching the issue of whether petitioner was in custody at the moment of his identification, there is no evidence in the record

to support the conclusion that Surinder believed petitioner was in police custody, which would have arguably highlighted him as the suspect, or that the police otherwise prompted him to choose petitioner. To the contrary, the record indicates that Surinder's identification was spontaneous, even though he was riding in the back of a police car at the urging of the police. Indeed, there were between fifteen and twenty people on the street in front of Mars Deli, petitioner was not handcuffed, Saccone did not prompt him, and, to the extent that petitioner was confronted by the police, they were not in uniform.

Furthermore, petitioner has not established that Simonetti and Saccone coordinated petitioner's <u>Terry</u> stop to coincide with the neighborhood canvass. The testimony at trial and at the hearing supports the conclusion that the timing of the identification was accidental. An accidental confrontation is much less likely to be suggestive or warrant condemnation as police misconduct. <u>See, e.g.</u>, <u>United States v. Lopez-Lopez</u>, 282 F.3d 1, 11 (1st Cir. 2002) (procedure not unnecessarily suggestive when police officers returned to the station unaware that suspects had been arrested and, not anticipating an identification procedure, inadvertently spotted suspects and spontaneously identified them); <u>United States v. Neverson</u>, 463 F.2d 1224, 1231 (D.C. Cir. 1972) (identification resulting from accidental street confrontation did not violate due process);

<u>United States v. Serna</u>, 799 F.2d 842, 847 (2d Cir. 1986) (no

evidence that meeting between witness and suspect in cafeteria

was prearranged and therefore not suggestive).  When viewed in

the totality of circumstances, petitioner has not shown that the

identification procedure was unnecessarily suggestive.


B.    <u>Reliability</u>

      Even were the identification procedure unnecessarily

suggestive, the record does not support the conclusion that the

identification was otherwise unreliable.  For the same reasons

the identification procedure was not suggestive, the

identification itself bore sufficient indicia of reliability to

make the probability of misidentification slight.  <u>See</u> <u>Bautista</u>,

23 F.3d at 730.  In addition to the reasons stated above, the

likelihood of misidentification is further reduced because

Surinder knew petitioner before the robbery.  <u>See</u> <u>id.</u> (using

witness's opportunity to observe suspects on previous occasions

to bolster reliability of identification).  An identification may

be relied upon in situations, like this one, in which an

unprompted witness, viewing a crowded city sidewalk,

spontaneously points to his assailant with whom he was familiar

before the attack.  <u>See, e.g.</u>, <u>Coleman v. Alabama</u>, 399 U.S. 1, 6

(1970)(finding spontaneous identification reliable); <u>United

States v. Lawrence</u>, 349 F.3d 109, 116 (3d Cir. 2003)("Most

importantly, however, both of those witnesses knew [the defendant] and had seen him on multiple occasions before the shooting.").  See also Kirby, 406 U.S. 690-91 (finding that due process was not violated by inclusion of evidence of identification resulting from one-to-one confrontation when the identification in a station house was spontaneous and immediate); United States v. Telfaire, 469 F.2d 552, 556-57 (D.C. Cir 1972) (rejecting defendant's request for a special jury instruction on the risks of misidentification in case where witness's identification of defendant was spontaneous at the scene of the crime).  Petitioner has not demonstrated that the identification procedure was unnecessarily suggestive or likely to result in misidentification, let alone that the hearing court unreasonably applied Supreme Court decisions.  Thus, this ground for habeas relief is rejected.


## Conclusion

Petitioner has shown no basis for relief under § 2254, and, therefore, his petition is denied.  The Clerk of the Court is directed to enter judgment accordingly and close the case.

In addition, because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.  See 28 U.S.C. § 2253(c); Lucidore v. N.Y. Div. of Parole, 209 F.3d 107, 111-13 (2d Cir. 2000).


Dated:      Brooklyn, New York
            September 16, 2008

                              SO ORDERED:


                              _____/s/_____
                              David G. Trager
                              United States District Judge